LittletoN, Judge,
concurring:
The first issue is whether the income derived by a lessee of Oklahoma school lands from the operation of oil and gas wells under a lease from the State of Oklahoma is exempt from taxation and depends upon whether the establishment and maintenance by the State of a system of public, schools were essential governmental functions, and, if so, whether the granting by the State of oil and gas leases on lands owned by it and devoted exclusively to school purposes was the exercise of a governmental power of such a character as would exempt the instrumentalities employed by the State from taxation by the Federal Government.
Section 3 of the enabling act of Congress, approved June 16, 1906, 34 Stat. 267, entitled “An act to enable the people of Oklahoma and of the Indian Territory to form a constitution and State government and be admitted into the Union on an equal footing with the original States ”, provides “ That provisions shall be made for the establishment and maintenance of a system of public schools which shall be open to all the children of said State * * *; ” section 7 provides “ That upon the admission of the State into the Union sections numbered sixteen and thirty-six, in every township in Oklahoma Territory, and all indemnity lands heretofore selected in lieu thereof, are hereby granted to the State for the use and benefit of the common schools; * *
*78 By section 8 of the enabling act the United States granted to the State of Oklahoma certain other lands “ for the use and benefit of the University of Oklahoma and the University Preparatory School, one-third; of the normal schools now established or hereafter to be established, one-third; and of the Agricultural and Mechanical College and the Colored Agricultural Normal University, one-third. The said lands or the proceeds thereof as above apportioned shall be divided between the institutions as the legislature of said State may prescribe: Provided, That the said lands so reserved or the proceeds of the sale thereof shall be safely kept or invested and held by said State, and the income thereof, interest, rental, or otherwise, only shall be used exclusively for the benefit of said educational institutions. Such educational institutions shall remain under the exclusive control of said State, and no part of the proceeds arising from the sale or disposal of any lands herein granted for educational purposes, or the income or rentals thereof, shall be used for the support of any religious or sectarian school, college, or university.” This section further provided that where any of the lands granted were valuable for minerals, which terms included gas and oil, such lands should not be sold by the State prior to January 1, 1915, but might be leased by the State by public competition after due advertisement, and that all such leasing should be done under sealed bids and awarded to the highest responsible bidder.
Section 9 provided that said sections sixteen and thirty-six, and the lands taken in lieu thereof, granted for the support of common schools, if sold, might be appraised and sold at public sale in one hundred and sixty acre tracts or less under such rules and regulations as the legislature of the State might prescribe; but that said lands might be leased for periods not to exceed ten years.
Section 22 o.f the enabling act provides “That the constitutional convention provided for herein shall, by ordinance irrevocable, accept the terms and conditions of this act.”
In section 1 of Article XI of the Oklahoma constitution, the grant contained in the enabling act was accepted in the following language:
*79 “ The State hereby accepts all grants of land and donations of money made by the United States under the provisions of the enabling act, and any other acts of Congress, for the uses and purposes and upon the conditions, and under the limitations for which the same are granted or donated; and the faith of the State is hereby pledged to preserve such lands and moneys and all moneys derived from the sale of any of said lands as a sacred trust, and to keep the same for the uses and purposes for which they were granted or donated.”
The State thus assumed in its sovereign capacity the obligation to establish and maintain such a system of public schools as a governmental power and function. Section 32 of Art. VI of the Oklahoma constitution creating a branch of the executive department known as “ the commissioners of the land office ”, to which was given the management of school lands of the State and of the funds derived therefrom, provided that the commissioners of the land office should be composed of the governor, the secretary of state, the State auditor, the superintendent of public instruction, and the president of the board of agriculture.
The first legislature of the State of Oklahoma enacted certain provisions with reference to the lands granted by the enabling act and these enactments are found in sections 9415 to 9424 of Comp. Stats, of 1921, with respect to the leasing of State-owned lands. Section 9423 provides that “ The proceeds derived in bonuses and royalties and from other inducements and considerations for the execution and operation of the oil and gas leases in this article provided, shall be carried in the several funds, for the use and benefit of which such lands were granted by the United States to the State of Oklahoma, and to the territory now comprising the area embraced within the said State, under the provisions of the enabling act, and any and all other acts of Congress, for the uses and purposes, and upon the conditions, and under the limitations for which the same were granted; and the money resulting from such lease and from the operation thereof shall be handled, disposed of, and used in like manner as the other moneys belonging to said several funds under the laws of this State.”
*80 Section 5 of Art. XI with the lands granted by section 8 of the enabling act for the use and benefit of the University of Oklahoma, the University Preparatory School, the State normal schools, and the State agricultural and mechanical colleges. These are all State schools, established and maintained as such, and constitute a part of the State’s educational system (Comp. Okla. Stat. 1921, chap. 86); and the provisions of the enabling act (sec. 8) and the legislation of the State (sections 9415 and 9424, Comp. Okla. Stat. 1921) respecting the leasing for oil and gas purposes apply equally to those lands.
It was under and pursuant to the foregoing constitutional and statutory provisions that all of the leases to the plaintiff were executed.
It is argued by the defendant that this issue is not analogous to the question decided by the court in Gillespie v. Oklahoma, 257 U.S. 501, for the reason that in the Gillespie case the United States acted in its capacity as a guardian of the Indian wards and that this was strictly a governmental function of the highest character; that the employment by the United States of instrumentalities in the operations on Indian lands related to the carrying out by the sovereign of its treaty obligations, or obligations imposed by Congress, with the Indians; and that the obligations of the United States and the nature of its functions in carrying them out were the same whether arising under the treaty with the Indians or under an act of Congress. It is therefore insisted by the defendant that the establishment and maintenance of schools and colleges by the State of Oklahoma are not governmental functions of the character with which the court was concerned in the Gillespie case and are not the exercise of a stricthy governmental power that will exempt from taxation the instrumentalities employed by the State as a means of carrying on operations upon State-owned school lands. It is further argued by the defendant that the State of Oklahoma held these lands as a proprietor rather than as a guardian, and that its operations thereon, either in its sovereign capacity or in conjunction with some other instrumentality *81 selected by it, partake of the nature of private business, and under the rule laid down by the court in South Carolina v. United States, 199 U.S. 437, and Metcalf & Eddy v. Mitchell, 269 U.S. 514, the income derived from such operations is not exempt from taxation under constitutional immunity contended for by the plaintiff. In support of this contention the defendant points out that a circular issued in 1924 by the United States General Land Office shows that the Federal Government has granted its various States for school purposes the total of 171,789,775.92 acres of land, the school (lands in Texas being additional, and that these lands are leased by the State for grazing and agricultural purposes and for oil and mineral developments, and argues that the ■logic of a decision holding that the granting of oil and gas leases for the exploration and removal of oil and gas from ■these lands, resulting in the receipt of income, would in.evitably lead to further exemption; that if the farming and mining operations of a State’s lessee are immune from Federal taxation, no limitation could be placed on the application of the exemption rule; that the danger involved in such holding was pointed out in South Carolina v. United States, supra. And if these oil and gas operations of the State of Oklahoma are held to be of a strictly governmental character, every other activity connected with the use of State-owned lands would partake of the same character; that at .the power sites on these lands the State might construct dams and develop and market hydroelectric power, and, in connection with the same dams, it might build and operate irrigation systems and sell water rights for reclamation purposes; that, in order to convey these crops into the most ¡profitable form, it might build and run mills and factories; ■it might open and work mines of coal and iron, develop ■stone quarries, and engage in the lime and cement business; ■that, for the purpose of securing the utmost return from its ‘holdings, the State might enter each and every business connected with the utilization of the soil, limited only by the natural capacity of the real estate owned;.that no distinction can be drawn between the activities just mentioned and •the operations for oil and gas involved in this case; and that if the income of the plaintiff in this case is held to be exempt *82 all activities of the character above mentioned would be strictly governmental, because they would involve the development of the State’s property. It is finally urged that every such power plant, irrigation system, farm, mine, quarry, limekiln, cement works, mill, and factory when leased by the State would carry with the lease exemption from Federal taxation of all profits made therefrom by the lessee and this would provide the situation which the court evidently had in mind when it decided South Carolina v. United States, supra, in which the court said: “Mingling the thought of profit with the necessity of regulation may induce the State to take possession, in like manner, of tobacco, oleomargarine, and all other objects of internal-revenue tax. If one State finds it thus profitable, other States may follow, and the whole body of internal-revenue tax be thus stricken down.” The contentions of the defendant seem to overlook the fact that it is not the extent of the activities of a State that determines the exemption but the nature and character of power by which it performs them. The granting by the State of Oklahoma of thé leases in this case did not arise from the necessity or power of regulation but in the exercise by the State of a sovereign power in the fulfillment of an essential governmental obligation to establish and maintain a system of public schools. In Indian Motocycle Company v. United States, 283 U.S. 570, the court pointed out that “ The reasons underlying the principle mark the limits of its range ”, and that “ Where the principle applies it is not affected by the amount of the particular tax or the extent of the resulting interference but is absolute.”
The establishment and maintenance of a system of public schools, State colleges, and universities by the State in conformity with the provisions of its constitution and its laws are essential governmental functions; School District v. Zediker, 4 Okla. 599, 603; Board of Education v. State, 26 Okla. 366, 370; State ex rel. v. Ross, 76 Okla. 11; Consolidated School District No. 1 v. Wright, 128 Okla. 193; Claybrook v. City of Owensboro, 23 Fed. 634; Harris v. Salem School District (N.H.), 17 Atl. 332; Scown v. Czarnecki (Ill.), 106 N.E. 276, 279. In City of New Orleans v. Salmon *83 Brick & Lumber Co., 135 La. 827, the court said, “ Education insures domestic tranquillity, provides for the common defense, promotes the general welfare, and it secures the blessings of liberty to ourselves and our posterity. It has ever been recognized as a function of government by all the States of the Union. The free-school system being one of the instrumentalities or functions of the government of the State of Maryland, it cannot be interfered with by the State of Louisiana or any of its citizens.”
A State may own real estate in three distinct characters: First, as a sovereign and not as a proprietor, such as a bed of navigable water which is held for public use; secondly, as a proprietor and not as a sovereign, such as land owned by one State but situated in another and property acquired by the State with which to carry on a business such as was involved in South Carolina v. United States, supra; and thirdly, in the joint character of sovereign and proprietor. In this class school land owned by Alabama as a proprietor and situated in Nebraska was held to be nontaxable. Stoutz v. Brown, 5 Dill. 445; Fed. Case 13505. And school land owned by Maryland as a proprietor and situated in Louisiana was also held to be nontaxable; City of New Orleans v. Salmon Brick & Lumber Co., supra. The school lands owned by Oklahoma within its own limits come within this category.
In view of the conclusion that the establishment and maintenance of a system of public schools by the State are essential governmental functions, its transactions with reference to the lands owned and devoted exclusively to school purposes and the means and instrumentalities employed by it, in performing this function, fall within the class which the United States cannot tax consistently with the constitutional principle. Dobbins v. Commissioners of Erie County, 16 Pet. 435, 448, 449; Collector v. Day, 11 Wall. 113, 124; Western Union Telegraph Co. v. Texas, 105 U.S. 460, 466; Williams v. City of Talladega, 226 U.S. 404, 418-419; Choctaw, Oklahoma & Gulf R.R. Co. v. Harrison, 235 U.S. 292; Indian Territory Illuminating Oil Co. v. State of Oklahoma, 240 U.S. 522; Howard v. Gypsy Oil Co., 247 U.S. 503; Large Oil Co. v. Howard, 248 U.S. 549; Gillespie v. State of Okla *84 homa, 257 U.S. 501; Jaybird Mining Co. v. Weir, 271 U.S. 609; Panhandle Oil Co. v. Mississippi ex rel. Knox, 277 U.S. 218. In Indian Motocycle Co. v. United States, 283 U.S. 570, 575, the court in holding that the Federal Government could not impose and collect a manufacturers’ excise tax. upon the sale of motorcycles to the police department of a municipality, said:
“ It is an established principle of our constitutional system' of dual government that the instrumentalities, means, and operations whereby the United States exercises its governmental powers are exempt from taxation by the States, and. the instrumentalities, means, and operations whereby the-States exert the governmental powers belonging to them are equally exempt from taxation by the United States. This principle is implied from the independence of the National' and State Governments within their respective spheres and from the provisions of the Constitution which look to the-maintenance of the dual system. Collector v. Day, 11 Wall. 113, 125, 127; Willcuts v. Bunn, 282 U.S. 216, 224-225. Where the principle applies it is not affected by the amount of the particular tax or the extent of the resulting interference, but is absolute.”
Salaries paid by the State to persons employed by it in the maintenance of schools and colleges and as instruct tors therein would be exempt from taxation; Dobbins v. Commissioners of Erie County, supra. And if it should' happen that the State in the operation of such schools- and colleges, including operations and all transactions with reference to property devoted exclusively thereto, should derive an income the State would not be taxable thereom by the Federal Government. Likewise, if the State of Oklahoma in this case had operated the oil and gas wells on the-State-owned lands in question, the income of which belonged exclusively to the school fund, it would not be taxable thereon. The plaintiff was an instrumentality employed' by the State in the performance of its governmental functions and the income derived by him from the operation of oil and gas wells under the leases was exempt from' taxation by the United States.
The second issue is whether the net profit of $377,320.55-derived by the plaintiff upon the sale by him in 1918 of aa *85 lease which he had theretofore entered into with the State of Oklahoma and the net profit of $2,218,445.58 derived by him in 1919 upon sale- by him of certain leases theretofore granted to him by the State of Oklahoma, totaling $2,595,-766.08, were exempt from taxation by the Federal Government. The precise question presented is the constitutionality of a tax on income to the extent that such income includes net gains derived by the owner of leases on State-owned school lands from the sale of such leases.
When the plaintiff made a sale at a net profit to him of the leases which had been granted to him by the State he was not acting as an instrumentality of the State, nor can it be said that the imposition of a tax upon such net profit would hamper or burden the State in the exercise of its governmental functions. The relation of the State to plaintiff’s profits on the sale of leases is one step more distant than its relation to Iris profits in operating under the leases in conjunction with the State. This fact gives an added reason for denying plaintiff’s claim as to the net profits upon the sale. Willcuts v. Bunn, supra. The reasons given by the court for holding in the Willcuts case that a profit derived from the sale of municipal bonds is taxable are applicable to the net gain derived by the plaintiff from the sale of the leases in question. The relation of the tax to the lease in this case is, if anything, more remote than a tax on transfers of decedents’ estates measured by a value which includes exempt securities. There the tax upon transfers is certain if the value of the property reaches the statutory requirements. Here the tax is upon a net gain derived from a transfer in the form of a sa.le, and the contingencies of gain from the sale, as well as the fact of net income in a taxable amount, are added conditions precedent which render the prospective tax one step more remote. Moreover, the injury here is neither obvious nor appreciable. As was said by the court in Willcuts v. Bunn, supra, at page 230, “No facts as to actual consequences are brought to our attention,, either by the record or by argument, showing that the inclusion in the Federal tax of profits on sales of State and municipal bonds casts any appreciable burden on the States’ borrowing power. *86 We are left to the inadequate guidance of judicial notice.” And again, at page 231, “ Indeed, the existence of the illegal burden might be more easily assumed in the case of the estate tax, where the entire value of the securities, and not merely gains on sales, are taken into the reckoning in determining the amount of the tax.” Finally, at page 234, it said:
“ The history of income-tax legislation is persuasive, if not controlling, upon the question of practical effect. Plummer v. Coler, supra (p. 137, 138). Before the power of the Congress to lay the excise tax in question can be denied in the view that it imposes a burden upon the States’ borrowing power, it must appear that the burden is real, not imaginary; substantia,1, not negligible.”
The provision in the leases requiring the consent of the commissioners of the land office of the State to their sale or transfer does not have the effect of exempting the profits derived upon such sale from taxation.
Additional Findings of Foot and Opinion, on New Trial
[June 5, 1933]
This case is now before the court on a new trial granted on plaintiff’s motion with respect to the taxability of profits derived by him from the sale of leases acquired from the State of Oklahoma.
At the first trial two questions were presented: First, whether the profits derived by plaintiff from the sale of oil and gas produced from school lands leased by the State of Oklahoma were subject to Federal income tax; and, second, whether the profits derived by plaintiff from the sale of such leases on State lands were immune from Federal income taxation. We decided the first question in favor of plaintiff in the opinion rendered December 7, 1931, and entered judgment in his favor for $153,582.38 with interest, which judgment has been paid. See Burnet v. Coronado Oil & Gas Co., 285 U.S. 393. The second question was decided in favor of the United States and recovery of the tax paid upon the profits derived by plaintiff from *87 the sale by him of the leases which he had acquired from the State of Oklahoma was denied.
The court, having made the foregoing introductory statement, made the following additional special findings of facts with respect to the question before the court.
I. Prior to 1916 very few leases for oil and gas purposes on its public lands had been offered for sale by the State of Oklahoma. Prior to 1918 the question, whether income derived from the operation of leases on public school lands of the State of Oklahoma and profits derived from the sale of such leases by lessees thereunder, or either such income or profits, were taxable by the Federal Government, had not been raised in the oil and gas industry, and the bidders for and purchasers of such leases from the State generally bid for and purchased the same without giving consideration to the question whether the income derived by the lessee from the operation of such leases or the profits from the resale thereof would be taxable by the Federal Government.
II. Since the latter part of 1917, or the first part of 1918, when the question of the nontaxability by the State of Oklahoma of the income and profits of lessees derived from leases upon lands of restricted allottees of the Indian tribes was being raised and decided in suits in the Federal courts, a large number of bidders for and purchasers of leases upon public school lands of the State have given consideration to the probability that income derived from the operation of such leases and profits derived from the sale thereof were nontaxable by the Federal Government, and were influenced by this consideration to bid a greater amount for such leases, and, when successful in their bid, to pay a greater price therefor.
III. The question whether profits from the resale of such leases by the lessees are taxable by the Federal Government has never been finally settled by the courts; and the question whether the income from the operation of such leases is taxable had never been decided by the Supreme Court of the United States until its decision in the case of Burnet v. Coronado Oil and Gas Company, rendered April 11, 1932.
*88 • IV. Lessees of oil and gas leases in Oklahoma are divided into two well-defined classes. The first class consists of a relatively small number of the larger oil companies engaged, either directly or through their aifiliated companies, in carrying on all branches of the oil industry, including the acquisition and development of leases and the production, transporting, refining, and marketing of oil and gas and the products and by-products thereof. The second, and by far larger class, constituting approximately 90 percent of such lessees, consists of individuals and corporations who acquire leases for the purpose of resale and who resell the same in many instances before production has been discovered or exploration has been commenced upon the lease itself. There are only two sources of profit to a lessee from an oil and gas lease: First, profits derived from the resale of the lease before or after some development thereof; second, net income derived from the sale of oil or gas produced by the lessee from the lease. Oil and gas leases, before exploration and development, are highly speculative in character.
The location and commencement of a well upon a geological structure, or upon any one of a block of contiguous leases, substantially increases the market value of all other leases in the block or on the structure in or on which is located the lease on which the well is commenced, the degree of enhancement in value depending largely upon the location of the lease on the structure and its nearness to the exploration well, generally called the test or wildcat well. The discovery of oil in such test well on any lease further greatly enhances the market value of all the leases in the block or upon the structure, the degree of enhancement depending upon the character and amount of production of such well and the location of such other leases upon the structure and their proximity to the well. The bringing in of a producing well upon a lease very greatly increases the market value of such lease, the degree of enhancement in value being determined largely by the amount and character of production of oil found thereon. The resulting increased value of such a lease is sometimes almost fabulous. The drilling of a dry hole on or in the vicinity of a lease *89 «always greatly reduces and generally wholly destroys its market value.
V. It is the general and almost universal practice of the members of the oil and gas industry who drill, test, or wildcat wells to acquire direct from the owners of the lands, or from the original oil and gas lessees thereof, leases covering ■blocks of acreage upon the same structure or in the vicinity of the proposed location of a test well; and upon the location or commencement of the well, or at some subsequent stage of •the exploration and development, sometimes before and sometimes after the completion of the test well, to sell off undivided interests in the leased acreage so acquired in the block, or entire leases or parts thereof, at the enhanced market value, thereby financing the cost of drilling such test well, •or of a part thereof, and, where such sales are made before •completion of the well, reducing the risk of loss from such .exploration. Such method of financing the cost of such ■exploration is in many instances the lessee’s only means of financing the same.
YI. By far the greater number of bidders for and purchasers of oil and gas leases from the State of Oklahoma ¡upon its public-school lands belong to the second class mentioned in finding IV. Ninety percent or more of such bidders and purchasers have been and are of that class. Approximately 90 percent of the leases sold by the State ■,or some interest therein are resold by the State’s lessees, and many of such leases are sold several times. From the •year 1915 to 1931, inclusive, the State offered for sale and ■sold 2,841 oil and gas leases on its public lands. During .the same period there were 3,092 sales or assignments of sueh leases by lessees. In many cases the entire interest of the lessee in the lease was sold and assigned. In others only an undivided interest therein, or the entire interest of the lessee under the lease upon a portion, but not upon the whole acreage covered by the lease, was sold. With •only few exceptions, leases for oil and gas purposes on the lands of the State have been in the past and are now, as ^provided by statute, offered for sale by the State in tracts mi 160 acres or less,' upon sealed bids, to the highest bidders *90 for cash. Such leases reserve to the State a fixed royalty of one-eighth (%) of the oil and gas produced thereunder. Ninety percent or more of the bidders for and purchasers of such leases from the State have been persons and corporations who buy and resell leases rather than persons and corporations who acquire leases and hold and develop them to produce and sell the oil therefrom.
VII. If the profits derived from the resale of such leases by the lessees of the State are held subject to income and excess-profit taxes by the Federal Government, that holding will have the effect to restrict and limit substantially the market for such leases, and to substantially lessen the price obtainable by the State therefor.
VIII. Of the public lands of the State of Oklahoma, approximately 100,000 acres have been reserved from sale as lands probably valuable for oil and gas purposes and for leasing for such purposes by the State. Of these lands, approximately 200,000 acres have been heretofore leased and are now under lease for oil and gas purposes. Approximately 500,000 acres thereof are held by the State and reserved from sale for the purpose of leasing the same for oil and gas purposes from time to time as and when it can do so to the best advantage.
IX. The only sources of revenue to the State from its public lands because of their mineral character are, first, the bonus or fixed price for which the State can and does sell leases thereon; second, the royalty reserved in the leases sold by the State of one-eighth (%) of the oil and gas produced therefrom; third, an annual rental of one dollar ($1.00) per acre for each year after the first year during which the commencement of a well upon such leases is deferred, the fixed term of which leases is five (5) years, unless oil or gas is sooner produced thereon. From all three of these sources of revenue the State of Oklahoma has received between ten and eleven million dollars, of which amount approximately six million dollars has been received as bonuses for the cash price paid by the purchaser of the leases, and the remainder thereof, in the approximate sum of five million dollars, has been received as royalties out of *91 production of oil and gas and as rentals under the leases for the privilege of delaying commencement of wells thereon.
X. The income and excess-profit taxes for the year 1917,. assessed against and collected from plaintiff upon and because of $214,707.92 of net income from the sale of oil and gas produced by him on section 36, township 20 north, range 5 east, Pawnee County, Oklahoma, under a lease of' August 14, 1912, and the interest paid by him thereon have, during the pendency of this proceeding, been refunded and repaid by the Treasurer of the United States.
XI. The tax assessed against and collected from plaintiff for 1918 upon and because of net income of $50,653.48 derived by him during that year from the sale of oil and gas-produced by him on section 36, township 20 north, range 5 east, Pawnee County, Oklahoma, under the lease of August 14,1912, and interest thereon, have been during the pendency of this proceeding refunded and repaid to plaintiff by the Treasurer of the United States.
XII. If the plaintiff’s net income of $377,320.55 received by him during 1918 as net profits on the sale of the oil and' gas leases of July 16, 1918, as set forth in finding IV of the original findings of the court on December 7, 1931, and his net income of $2,218,445.53 received during 1919 as net profits-on the sale of the leases of July 16, 1918, as set forth in¡ finding V of the original findings of December 7, 1931, are not taxable by the United States, plaintiff is entitled to judgment for $927,314.19, with interest, as provided by law.. However, if such income received by plaintiff during 1918 and 1919 as profits from the sale of the oil and gas leases of July 16, 1918, was subject to tax, plaintiff is not entitled to recover and the defendant is entitled to judgment and to dismissal of the petition.
The court decided that plaintiff was not entitled to any recovery in addition to the amount of the original judgment, already received by him.
LittletoN, Judge,
delivered the opinion of the court:
Plaintiff’s motion for a new trial on the question whether-the profits derived by him from the sale of leases thereto *92 fore acquired from the State of Oklahoma were subject to Federal income tax was allowed with leave to take additional testimony with respect to this question. Additional ■evidence was taken and we have made additional special findings of facts as requested by the parties.
Plaintiff relies in general upon the principle announced in Gillespie v. State of Oklahoma, 257 U.S. 501, and applied in Burnet v. Coronado Oil & Gas. Co., 285 U.S. 393, and contends that the rule laid down by the court in these cases entitles him to judgment under finding VII herein that “ if the profits derived from the resale of such leases by the lessees of the State are held subject to income and excess-profits taxes by the Federal Government, that holding would have the effect to restrict and to limit substantially the market for such leases, and to substantially lessen the price obtainable by the State therefor.” He claims that the case of Willcuts v. Bunn, 282 U.S. 216, is also an authority in his favor upon the principle upon which he relies for the reason that in that case the court said “ before we can restrict their [the taxing acts’] application upon the ground of a burden cast upon the State’s borrowing power, where the tax is not laid upon the contract made by the State in the exercise of that power, or upon the amounts payable thereunder, but is laid upon the result of distinct transactions by private owners, it must clearly appear that a substantial burden upon the borrowing power of the State would actually be imposed. * * * Before the power of the Congress to lay the excise tax in question can be denied in the view that it imposes a burden upon the State’s borrowing power, it must •appear that the burden is real, not imaginary; substantial, not negligible.”
He therefore contends that the tax here in question must be held invalid on the ground that under the facts it has been made to appear that it casts a substantial burden upon the State’s leasing power and that its effect is to hamper the State’s efforts to make the best terms possible for its public schools, a function strictly governmental in character. The defendant also relies upon the case of Willcuts v. Bunn, supra, as authority for its position that the profits on the sale of the leases are subject to Federal taxation.
*93 We have again carefully considered this question in the 'light of the additional facts established on the new trial, .and in the light of the reargument and the authorities cited by the parties in support of their respective positions, and have again come to the conclusion announced in the opinion <of December 7, 1931, that plaintiff is not entitled to recover .and that the petition must be dismissed.
In Group No. 1 Oil Corp. v. Bass, 283 U.S. 279, the court had before it the question of the taxability of profits derived from oil leases on public lands of Texas. In that -State, unlike Oklahoma, the granting of a leasei on oil and gas lands constitutes a sale of oil and gas located beneath the :surface. The case therefore was one of a claimed immunity •from taxation because of the source of the title. The court, while recognizing that the State’s property before sale could not be taxed by the Federal Government, nOr could the sale thereof be taxed, said:
“But it does not follow that the same property in the hands of the buyer, or his use or enjoyment of it, or the income he derives from it, is also tax immune. New Brunswick v. United States, 276 U.S. 547; Forbes v. Gracey, 94 U.S. 762; Tucker v. Ferguson, 22 Wall. 527; see Weston v. Charleston, 2 Pet. 449, 468; Veazie Bank v. Fenno, 8 Wall. 533, 547. Theoretically, any tax imposed on the buyer with respect to the purchased property may have some effect on the price, and thus remotely and indirectly affect the selling Government. We may assume that if the property is subject to tax after sale, the governmental seller .will generally receive a less favorable price than if it were known in advance that the property in the hands of later owners, or •even of the buyer alone, could not be taxed.
“ But the remote and indirect effects upon the one government of such a nondiscriminatory tax by the other have never been considered adequate grounds for thus aiding the one at the expense of the taxing power of the other. See Willcuts v. Bunn, 282 U. S. 216, 231; Educational Films Corp. v. Ward, 282 U.S. 379; Metcalf & Eddy v. Mitchell, 269 U.S. 514, 523-524. This Court has consistently held that where property or any interest in it has completely passed from the Government to the purchaser, he can claim no. immunity from taxation with respect to it, merely because it was once Government owned, or because the sale of it effected some Government purpose. New Brunswick v. United States, supra; Forbes v. Gracey, supra; Tucker *94 v. Ferguson, supra; see Gromer v. Standard Dredging Co., 224 U.S. 362, 371; Choctaw, O. & G. R. Co. v. Mackey, 256 U.S. 531, 537; Central Pacific R. Co. v. California, 162 U.S. 91, 125; Railroad Co. v. Peniston, 18 Wall. 5, 35-37; Weston v. Charleston, supra, p. 468.”
The court recognized the principle of the Gillespie case, but, upon the basis that the property had passed to the buyer, held that the limits of the immunity had been exceeded. The income from the oil and gas produced was held in that case subject to tax by the Federal Government.
In Susquehanna Power Co. v. State Tax Commission of Maryland (No. 1), 283 U.S. 291, immunity was claimed, from State taxation because of the use of property otherwise taxable, pursuant to and in connection with a license-from the Federal Government. The court in denying the-claim for immunity said:
“Assuming, for present purposes, that the license of' the Power Commission is a Federal instrumentality, immune from taxation or other direct interference by the State, it does not follow that the property appellant uses-, in its power project is clothed with that immunity. The-exemption of an instrumentality of one government from-taxation by the other must be given such a practical construction as will not unduly impair the taxing power of' the one or the appropriate exercise of its functions by the-other. * * *.”
In the case of the Indian Motocycle Co. v. United States, 283 U.S. 570, the court reaffirmed the principle of immunity- and applied it in that case which involved a tax levied on the sale of motorcycles to a municipal corporation for use-in its police service, and distinguished the case of Willcuts v. Bunn, supray as follows: “ * * * for the taxes therein question were not laid on transactions involving an exertion of governmental functions and their bearing on governmental operations was so indirect or remote as to place therm outside the principle which is applicable here.”
In Burnet v. Coronado Oil & Gas Co., supra, the court applied the principle announced in the Gillespie case and held that income derived from the sale of oil and gas produced from lands leased from the State of Oklahoma was *95 exempt from tax, but indicated that the principle should not be extended. It was there said that: “We are disposed to apply the doctrine of Gillespie v. Oklahoma strictly and only in circumstances closely analogous to those which it disclosed. * * * ”
In Fox Film Corporation v. Doyal, 286 U.S. 123, the court declined to apply the principle of immunity where the burden upon the State was indirect and remote. In this case the court said:
“ The principle of the immunity from State taxation of instrumentalities of the Federal Government, and of the corresponding immunity of State instrumentalities from Federal taxation — essential to the maintenance of our dual system — has its inherent limitations. It is aimed at the protection of the operations of government (McCulloch v. Maryland, 4 Wheat. 316, 436), and the immunity does not extend ‘ to anything lying outside or beyond governmental functions and their exertions.’ Indian Motocycle Co. v. United States, 283 U.S. 570, 576, 579. Where the immunity exists, it is absolute, resting upon an 'entire absence of power’ (Johnson v. Maryland, 254 U.S. 51, 55, 56), but it does not exist ‘where no direct burden is laid upon the governmental instrumentality, and there is only a remote, if any, influence upon the exercise of the functions of government.’ Willcuts v. Bunn, 282 U.S. 216, 225.”
The immunity from taxation applies only where the tax would be a real and direct burden upon the State’s exercise of its governmental functions and it is our opinion that under the cases cited the burden upon the State of Oklahoma in leasing its public lands on the best possible terms, because of the tax- that may be exacted from the lessee upon the sale by him of his leases from the State, is so indirect and remote as to place it outside the principle that one government may not levy a tax; upon the functions or instrumentalities of another. Although it is shown in this case that a lessee of oil lands from the State of Oklahoma would pay more to the State for a lease in the first instance, if he were assured that profits from the sale of a lease would be exempt from Federal income tax, this was doubtless true in Group No. 1 Oil Corp. v. Bass, supra.
*96 The tax offends the implied constitutional prohibition-only if it is imposed directly upon a governmental instrumentality, or if, though it is not so imposed, its effect is to-place a direct and substantial burden upon the exercise of a governmental function. Willcuts v. Bunn, 282 U.S. 216; Metcalf & Eddy v. Mitchell, 269 U.S. 514. A gain derived by a taxpayer through a sale of property or interest therein acquired from a State, whether acquired in the form of a lease or by purchase, does not, in our opinion, fall within the implied constitutional prohibition against taxation. “The immunity does not extend to anything lying outside or beyond governmental functions and their exercise- * * Indian Motocycle Co. v. United States, supra. The immunity from taxation extends only to those agencies through which the State immediately and directly exercises its sovereign powers, and it is apparent that not everyone who uses his property or derives a profit, as a result of his dealings with the government, may clothe himself with immunity from taxation. Metcalf & Eddy v. Mitchell, supra.
Plaintiff is not entitled to recover and his petition is dismissed. It is so ordered.
Whaley, Judge; Williams, Judge; and GreeN, Judge,. concur.
Booth, Chief Justice, did not hear this case, on account of illness, and took no part in its decision.